## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO

DANIEL MURPHY,
 Plaintiff,

v.

PUERTO RICO PORTS AUTHORITY,
 Defendants.

Civil No. 98-2302 (HL)



### OPINION AND ORDER

Plaintiff Daniel Murphy brings this claim against Defendant Puerto Rico Ports Authority ("PRPA") for employment discrimination. He alleges that PRPA refused to hire him for the position of harbor pilot because of national origin discrimination. Murphy is a non-Hispanic resident of the continental United States. He brings this claim pursuant to Title VII of the Civil Rights Act of 1964[1] and section 1983.[2] He also brings, pursuant to the Court's supplemental jurisdiction, a claim under Puerto Rico's employment discrimination law.[3] The Court held a three-day bench trial on this matter. The parties have submitted their post-trial briefs, and the Court is now ready to rule.

### FINDINGS OF FACT

Based on all the evidence and testimony presented at trial, as well as the parties' stipulations in the pretrial order, the Court makes the following findings of fact:

1.     Murphy is a graduate of the Maine Maritime Academy. He has worked

---

[1] 42 U.S.C.A. §§ 2000e - 2000e-17 (West 1994 & Supp. 2001).

[2] 42 U.S.C.A. § 1983 (West Supp. 2001).

[3] 29 P.R. LAWS ANN. §§ 146 - 151 (1995 & Supp. 1998).



Civil No. 98-2302 (HL)                    2

as a merchant mariner since 1977. He became a master in 1986 and has an unlimited master's license, which allows him to be a master of any vessel at any tonnage. A master is in overall command of a vessel, its cargo, and its crew. During the time relevant to this cause of action, Murphy was employed by CSX Lines as a master of the vessel *CSX Crusader*. As the master of this vessel, he has sailed between the mainland United States and Puerto Rico approximately 300 times. [4]

2.      The *Crusader* is an old vessel that is approaching the end of its useful life. Once CSX decommissioned it, Murphy would be out of a job. In search of employment in a more stable area of the shipping industry, he applied in January 1995 to the PRPA to be a harbor pilot. [5]

3.      A pilot is responsible for the safe navigation and docking of a vessel while it is in a particular bay or harbor. The pilot should have particularized knowledge of that port's conditions and circumstances, knowledge which the vessel's captain or master may not necessarily have. In the ports and harbors of Puerto Rico, PRPA controls and regulates the pilot service and determines who shall receive a pilot's license. [6]

4.      In Puerto Rico, there are between fifteen and twenty harbor pilot positions. A pilot will be assigned to a particular port and will work only in that port. Approximately ten pilots work in San Juan. The remaining positions are distributed among the island's other ports in Yabucoa, Guayanilla, Las Mareas, Ponce, Mayagüez, Jobos, Guánica, and Tallaboa. [7]

---

[4] Docket no. 32, at 11; testimony of Daniel Murphy.

[5] Docket no. 32, at 11; testimony of Murphy.

[6] 23 P.R. LAWS ANN. §§ 2401 - 2418 (1999).

[7] Testimony of José Rivera; testimony of Gualberto Capdeville; joint exhibit X.

Civil No. 98-2302 (HL)                    3

5.      PRPA established a Pilot Advisory Board ("PAB") to evaluate applicants for the position of harbor pilot. The PAB would consider the applications and make recommendations to the executive director, who would then appoint the candidates recommended by the PAB. The PAB had five members: one represented PRPA; one the pilots who operated in San Juan; one the pilots who operated in Puerto Rico's other ports; one represented the local shipping trade; and one the foreign shipping trade.[8]

6.      To evaluate candidates, the PAB developed a point system whereby certain skills and experiences would be awarded different points. This point system was being used when Murphy applied for a harbor pilot position. The system considered the applicant's level of education; licenses; training or continuing education classes; tugboat experience; written examinations he had taken; and pilot endorsements for Puerto Rico's harbors. [9]

7.      An applicant was given five points for each harbor for which he held a pilot endorsement. To receive an endorsement, a candidate had to make a certain number of observer trips in a given harbor. That is, he would have to ride along with a practicing pilot while he was navigating a vessel in that harbor. Once the candidate had taken the requisite number of trips, he was then eligible to sit for the Coast Guard's exam for that harbor. If he passed the exam, the Coast Guard awarded him an endorsement. An applicant seeking an endorsement thus depended on the willingness of the practicing pilots to permit him to come along for an observer trip.[10]

8.      At the time he applied, Murphy had a pilot's endorsement for San Juan only. In 1997 he obtained endorsements for Yabucoa, Las Mareas, and Mayagüez.

---

[8] Plaintiff's exhibit 12; testimony of Rivera; testimony of Capdeville.

[9] Testimony of Rivera; testimony of Capdeville; Plaintiff's exhibit 33.

[10] Testimony of Murphy.

Civil No. 98-2302 (HL)                4

He found that some pilots were willing to help him, while others, such as those in Yabucoa and Ponce were not. Thus, in the case of Ponce, he was unable to make observer trips and could not obtain an endorsement for that port.[11]

9.    When there is a pilot opening in San Juan, a pilot assigned to one of the other ports will be transferred to San Juan. The transfer decision is based on seniority. This transfer will then create an opening in one of the other ports.[12]

10.    The PAB considered Murphy's application at a meeting in October 1995. At the time there were two vacant positions, and Murphy was one of seven finalists being considered. The PAB had reviewed the finalists' applications at an earlier meeting and awarded them points. In the interim the candidates had supplemented their applications. Murphy started out in fifth place with 85 points. With the supplementation, he moved up to 100 points. This should have put him in fourth place. The candidate with the next highest number of points was Roberto Candelario with 99 points.[13]

11.    At the October 1995 meeting, the PAB determined that, starting with this group of seven finalists, it would require that a candidate have, at a minimum, endorsements for Puerto Rico's six principal ports: San Juan, Ponce, Mayagüez, Guayanilla, Las Mareas, and Yabucoa. Candelario had endorsements for eight ports; Murphy had only San Juan. The members of the PAB decided that because these port endorsements were so important, they would award Candelario discretionary points so that he would be ranked ahead of Murphy. Thus, Candelario was moved into fourth place, and Murphy fell back to fifth. At the meeting, the PAB agreed to recommend that the two candidates with the highest number of points be selected and that the

---

[11] Testimony of Murphy.

[12] Testimony of Freddy Solis.

[13] Plaintiff's exhibit 30; testimony of Rivera.

Civil No. 98-2302 (HL)                    5

candidate with the third highest points be an alternate.[14]

12.    It appears that the PAB did not take a final action on these candidates until June 1997, when it recommended to PRPA's executive director that four of the seven finalists be appointed. The first two candidates were recommended for the pilot position; the next two were recommended for a deputy pilot position, which was an apprentice or training program. Neither Murphy nor Candelario was recommended at that time.[15]

13.    Between 1997 and 2000, seven pilots or deputy pilots were appointed. These candidates have endorsements for all the ports of Puerto Rico. Murphy was not one of these seven. Of the group of seven finalists with whom Murphy was considered in 1995, he was the only not hired by PRPA. The PAB gave discretionary points to at least two of these candidates: Candelario and Maffioli.[16]

14.    All of the six other finalists who were hired were residents of Puerto Rico. Two were born in Puerto Rico; one was born in Costa Rica but raised in Puerto Rico; and three were born in the continental United States. Between 1971 and 2000, all the pilots appointed by PRPA were Hispanic.[17]

15.    The PAB's evaluation system gave an applicant points based on skills regarding a vessel's trim and stability; watchstanding; and docking. Murphy did not receive points for any of these three skills, even though he had sufficient experience to qualify for them. However, because no formal licenses exist for them and because

---

[14] Plaintiff's exhibit 30; joint exhibit I.

[15] Joint exhibit XI.

[16] Testimony of Murphy; testimony of Rivera; testimony of George Maffioli; Joint exhibits I, VII, and XI; Plaintiff's exhibit 27; docket no. 32, at 12.

[17] Docket 32, at 12; joint exhibits I, II, III, V, and VI; testimony of Maffioli; testimony of Santiago Carrero.

Civil No. 98-2302 (HL)                    6

he did not know that the PAB gave points for these skills, he did not submit any documentation on his abilities in these areas. If he had been awarded these points, he would have been the highest ranked candidate when the PAB did its evaluation in October 1995.[18] The three additional port endorsements that he received in 1997 would have given him an even higher point total.

16.    Murphy's expert on the selection and training of pilots opined that the PAB's evaluation system was faulty in that it did not adequately measure those skills most needed to be a pilot; placed undue emphasis on port endorsements as a qualification criterion; did not give sufficient points to candidates such as Murphy who were trained in the merchant marine academy; and gave excessive points for experience in tugboat operations. He believed that this system favored Puerto Rico residents. He felt that the system was devised to favor local tugboat operators over applicants with experience in other areas of navigation and that this bias would result in less qualified candidates being hired over more qualified ones. The standard practice among port authorities in the rest of the country is exactly the opposite: to favor ship masters over tugboat masters. Additionally, the PAB's awarding of discretionary points to other candidates was not standard practice among port authorities. He also believed that Murphy was more qualified than any of the other candidates who were hired ahead of him.[19]

17.    The Yabucoa pilot who did not cooperate with Murphy in his attempt to get an endorsement for that port did not want to help him because he was not Puerto Rican. The pilot told Murphy that he would not be hired because he was not from Puerto Rico. Additionally, Luis Manuel Rivera, also a Yabucoa pilot, told Murphy

---

[18] Testimony of Murphy; testimony of MacElrevey; testimony of Rivera; Plaintiff's exhibit 33; joint exhibit VIII.

[19] Testimony of MacElrevey.

Civil No. 98-2302 (HL)                    7

that no "gringo" would ever be a pilot in Puerto Rico. Luis Manuel Rivera was not a member of the PAB.[20]

18.    Captain Paul Simpson, a non-Puerto Rico native, applied in 1988 or 1989 to be a pilot. Members of PRPA management told him that they had enough local people for the position. Another non-Hispanic, Greg Yoos, applied in 1987 and again in 1989, but he was never hired. Additionally, in 1970, Captain M.A. Dixon wrote a letter to the American Pilots Association complaining that he had applied to PRPA to be a pilot, but that the San Juan Pilots Association prevented him from being appointed because he was not Puerto Rican. On January 12, 1971, a PRPA official wrote a confidential memorandum on Dixon's application in which the official acknowledged that Dixon's complaint was true and that the Harbor Pilots Association was pushing certain candidates because they were Puerto Rican.[21]

## APPLICABLE LAW

### 1.    Title VII claim

Murphy claims that PRPA discriminated against him because he is not Hispanic. Title VII makes it illegal to "refuse to hire . . . any individual . . . because of [his] . . . national origin." 42 U.S.C.A. § 2000e-2(a)(1). In support of his claim, Murphy argues that PRPA failed to meet its burden under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05, 93 S.Ct. 1817, 1824-26, 36 L.Ed.2d 668 (1973). The Court disagrees with Murphy's

---

[20] Testimony of Murphy. It is unclear from Murphy's testimony whether Luis Manuel Rivera is also the pilot who did not want to cooperate with him in his attempt to get an endorsement for Yabucoa. The Court will assume that there were two Yabucoa pilots who made these comments to Murphy.

[21] Testimony of Paul Simpson; testimony of Greg Yoos; Plaintiff's exhibit 24, exhibits A and B.

Civil No. 98-2302 (HL)                    8

invocation of *McDonnel Douglas* in this case. Once the case has been submitted to
the fact-finder, the *McDonnel-Douglas* framework drops from the case. At this stage,
there remains the ultimate question: whether "'the defendant intentionally
discriminated against the plaintiff.'"[22] *United States Postal Serv. Bd. of Governors v.
Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1481-82, 75 L.Ed.2d 403 (1983) (quoting
*Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089,
1093, 67 L.Ed.2d 207 (1981)); *McGill v. Muñoz*, 203 F.3d 843, 845-46 (D.C.Cir.
2000); *Sanchez v. Puerto Rico Oil Co.*, 37 F.3d 712, 720 (1st Cir. 1994). Plaintiff
retains at all times the ultimate burden of persuasion on this question. *Reeves v.
Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 2106, 147
L.Ed.2d 105 (2000); *Febres v. Challenger Caribbean Corp.*, 214 F.3d 57, 60 (1st Cir.
2000).

The Court holds that Murphy has not satisfied his burden. There is evidence
that the PAB required applicants to have endorsements for Puerto Rico's major ports;
that this requirement favored local tug boat operators; and that the PAB's point
system favored tug operators in general.[23] The testimony further indicates that this
bias is not justified by the requirements of the harbor pilot position and that in fact
such a bias was not a sound practice.[24] The evidence also indicates that Murphy was
not hired because he was not a tug operator and because he did not have a sufficient

---

[22] Even if the *McDonnel Douglas* burden shifting were applied to this case, PRPA
would satisfy its burden. It has articulated a legitimate, non-discriminatory reason for its
actions. That is, there is evidence that Murphy was not hired because he did not have the
pilot endorsements for all of Puerto Rico's major ports. *See* testimony of Carrero;
testimony of Solis.

[23] Testimony of MacElrevey; testimony of Rivera; testimony of Solis; Plaintiff's
exhibit 30.

[24] Testimony of MacElrevey.

Civil No. 98-2302 (HL)                 9

number of Puerto Rico port endorsements. Title VII does not apply to discrimination against a person based on his occupation. *See* 42 U.S.C.A. § 2000e-2(a)(1). The PAB favored tug boat operators. This favoritism was due to a belief – albeit a misguided one – that tug operators were the most qualified candidates. It was also due to favoritism or cronyism between PAB members and tug boat operators. Title VII, however, does not make cronyism illegal. *Foster v. Dalton*, 71 F.3d 52, 56-57 (1st Cir. 1995); *Lawton v. State Mut. Life Assurance Co.*, 924 F.Supp. 331, 344 (D.Mass. 1996); *see also DeNovellis v. Shalala*, 124 F.3d 298, 306-08 (1st Cir. 1997).

For Murphy to meet his burden, he had to present evidence to show that this favoritism towards local tug boat operators could be equated to a bias against non-Hispanics. The evidence is insufficient to support this inference. There is no evidence on the ethnic make up of tug boat operators working in Puerto Rico. The evidence indicates that the successful candidates were given preferential treatment because they had tug boat experience or because they had a large number of endorsements for Puerto Rico ports. The evidence presented would also support an inference that a non-Hispanic working as a tug boat operator in Puerto Rico who had these endorsements would also benefit from the same biases in the system.

Murphy does claim to have evidence of anti-Hispanic prejudice in the PRPA. He points to the comment made to Captain Simpson in 1989 and the memorandum regarding the complaint of Captain Dixon in 1971. A statement may be used to show a discriminatory animus if it is contemporaneous to the alleged discrimination. The remoteness in time of a statement lessens its probative value. *Keeler v. Putnam Fiduciary Trust Co.*, 238 F.3d 5, 12-13 (1st Cir. 2001) (Statements made two years prior to the adverse employment actions were held not probative); *Geier v. Medtronic, Inc.*, 99 F.3d 238, 242 (7th Cir. 1996) (Supervisor's comment made a year before plaintiff's discharge); *Mulero-Rodríguez v. Ponte, Inc.*, 98 F.3d 670, 676 (1st Cir. 1996) (Statement made eight months prior to discharge); *Birkbeck v. Marvel*

Civil No. 98-2302 (HL)            10

*Lighting Corp.*, 30 F.3d 507, 511-12 (4th Cir. 1994) (Statement made two years prior to plaintiff's termination). Here, the remoteness in time of the comment made to Simpson and the memorandum on Dixon – respectively, six and twenty-four years prior to Murphy's applying – vastly diminishes their probative value as evidence that PRPA discriminated against Murphy because he was not Hispanic. Moreover, there is no indication that these comments were made by members of the PAB.

There is also evidence that two Yabucoa pilots told Murphy that no American would be a pilot in Puerto Rico. There is no indication that these pilots were members of the PAB or otherwise had any influence over the decision-making process. The biases of an individual who neither makes nor influences personnel decisions are generally not probative of discrimination. *Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 56 n.5 (1st Cir. 2000); *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 64 n.17 (1st Cir. 1999); *Shorette v. Rite Aid of Maine, Inc.*, 155 F.3d 8, 13 (1st Cir. 1998). Thus, this evidence is also unavailing to Murphy to prove that he was the victim of discrimination.

Murphy also presented the testimony of Oscar Camacho, a San Juan harbor pilot. His testimony was offered to rebut the testimony of Freddy Solis, the former president of the San Juan Harbor Pilots Association and a former PAB member. Solis testified that although he had heard people say that no "gringo" would ever be a harbor pilot in Puerto Rico, he did not agree with this sentiment. Camacho testified that he had heard Solis say that a requirement to be a harbor pilot was that you must be Puerto Rican. The Court finds Solis to be the more credible witness. Camacho's testimony was indefinite in a number of ways. Initially he testified that Solis made this comment "many times," later he changed this to two or three times. When asked when Solis made these comments, Camacho originally replied that Solis said this a couple of years ago, three weeks ago, and four weeks ago. Later he said that Solis made these comments six or eight or ten months ago. He also failed to give a clear

description of the context of his conversation or conversations with Solis.

While these discrepancies were not egregious, the Court finds that they -- combined with Camacho's overall demeanor and manner of answering the questions - - detracted from his credibility. Thus, the Court gives more credibility to Solis on this matter. Moreover, even if the Court were to credit Camacho, it is not clear that this evidence would be sufficient for Murphy to meet his burden. Solis was only one of five members of the PAB. There is no evidence that the other four members believed that only Puerto Ricans could be harbor pilots or that Solis had influence over them on this issue.

There is certainly evidence that the hiring system devised by the PAB was prejudiced. This prejudice, however, was one in favor of local tug boat operators. Murphy has shown that many pilots were former tugboat operators and that the PAB was guilty of cronyism towards tug operators. This practice, by itself, does not violate Title VII. Murphy would have the Court make the inference that this cronyism can be equated to prejudice against non-Hispanics. Although it is a close call, the Court finds that the evidence is insufficient to support this inference. Accordingly, the Court finds for PRPA on Murphy's Title VII claim.[25] Murphy also raises a Law

---

[25] A Title VII claim may proceed under a theory of either disparate treatment or disparate impact. A disparate treatment claim is predicated on the existence of an employer's discriminatory motive. *Mullin v. Raytheon Co.*, 164 F.3d 696, 699 (1st Cir. 1999). A disparate impact claim is based on proof that the employer used an employment practice which, although facially neutral, fell more harshly on one group than another and could not be justified by business necessity. *Id.* at 699-700. Proof of a disparate impact claim will usually take the form of statistics comparing persons holding the jobs at issue against qualified applicants who do not. *Bramble v. Amer. Postal Workers Union*, 135 F.3d 21, 26 (1st Cir. 1998).

In the present case, Murphy does not explicitly raise a disparate impact claim. His claim is couched in terms of a disparate treatment claim: his chief argument is that PRPA intentionally discriminated against him and he cites to disparate treatment cases in his

(continued...)

Civil No. 98-2302 (HL)                    12

100 claim. Because he makes no separate argument for this claim, the Court treats it as one paralleling his Title VII claim and finds for PRPA on the same grounds used in the analysis of the Title VII claim.

   2.    *Section 1983 claim*

Murphy also brings a claim pursuant to section 1983 in which he alleges a violation of his right to equal protection. A claim under section 1983 has two essential elements: (1) the conduct complained of must have been committed under color of state law, and (2) the conduct must have worked a denial of rights that are protected by the Constitution or laws of the United States. *Martinez v. Colon*, 54 F.3d 980, 984 (1st Cir. 1995). With regard to the first element, the Court will consider PRPA to have been acting under color of state law. The second element has two aspects: (i) there must have been a deprivation of federal rights and (ii) there must have been a causal connection between the conduct complained of and the deprivation of rights. *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 559 (1st Cir. 1989); *Voutour v. Vitale*, 761 F.2d 812, 819 (1st Cir. 1985). A government entity may not be liable under section 1983 based on the respondeat superior doctrine. *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 690-92, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). Rather, liability will exist only if a custom or official policy of the entity caused the Plaintiff's deprivation of federal rights. *Id.*; *Fletcher v. Town of Clinton*, 196 F.3d 41,

---

[25](...continued)
briefings. In the pretrial order, Murphy does argue that PRPA discriminated against both him and others "similarly situated." To the extent that this is a disparate impact claim, it too fails. He presented no statistical evidence comparing pilots with the pool of qualified applicants. He did present a list of applicants who he claims were non-Hispanics and who he claims were not given consideration by PRPA. However, there is no evidence that these applicants were in fact qualified. In fact, Murphy's own expert testified that one of these applicants, Greg Yoos, was <u>not</u> qualified to be a pilot. *See* testimony of MacElrevey. Thus, to the extent that Murphy is making a disparate impact claim, it too is dismissed.

Civil No. 98-2302 (HL)                13

55 (1st Cir. 1999).

A plaintiff claiming an equal protection violation must show that state actors intentionally discriminated against him. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 1074-75, 145 L.Ed.2d 1060 (2000); *Judge v. City of Lowell*, 160 F.3d 67, 75 (1st Cir. 1998); *Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 896 (1st Cir. 1988). The mere existence of disparate treatment will not be, by itself, a sufficient basis to support an inference of a discriminatory motive. *Judge*, 160 F.3d at 80. There must be a causal link between the defendant's conduct and the plaintiff's membership in a protected class. *Id.* at 76-77. The analytical framework for proving discrimination under Title VII is also applicable to a section 1983 constitutional claim. *Lipsett*, 864 F.2d at 896.

In this case, the Court's analysis of Murphy's Title VII claim is equally applicable to his section 1983 claim. Accordingly, the Court holds that the evidence does not support an inference that PRPA had a custom or policy which resulted in Murphy's being discriminated against because of his national origin.

In conclusion, the Court holds that Murphy was not hired because of the excessive weight that the PAB put on port endorsements and because of a point system which favored local tug operators. The evidence does not support an inference that the PAB failed to recommend Murphy because he was not Hispanic. Accordingly, the Court finds in favor of PRPA.[26]

**IT IS SO ORDERED.**

San Juan, Puerto Rico, August 3 0 2001.

HECTOR M. LAFFITTE
U.S. District Judge

---

[26] The Court notes that subsequent to the bench trial, PRPA appointed Murphy a harbor pilot on a probationary basis. *See* docket nos. 44-46.